SKY'S THE LIMIT, INC., Appellant

v.

ZONING HEARING BOARD OF SMITHFIELD TOWNSHIP and Smithfield Township.

Commonwealth Court of Pennsylvania.

Argued March 8, 2011.

Decided March 31, 2011.

Todd W. Weitzman, Stroudsburg, for appellant.

Jeffrey A. Durney, Tannersville, for appellee Zoning Hearing Board of Smithfield.

Ronald J. Karasek, Bangor, for appellee Smithfield Township.

BEFORE: PELLEGRINI, Judge, and BROBSON, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Sky's The Limit, Inc. (STL) appeals from the order of the Court of Common Pleas of Monroe County (trial court) affirming the Zoning Hearing Board of Smithfield Township's (Board) decision that under the Smithfield Township Zoning Ordinance (Zoning Ordinance), camping is not an accessory use to an airport and the Zoning Ordinance does not allow for camping activities on the Pocono Stroudsburg Airport (Airport) property. For the reasons that follow, we affirm.

STL is a New York corporation, owned and operated by Jeffrey Root (Root), which operates a skydiving business on a portion of the Airport pursuant to a lease agreement. Robert Strenz (Strenz) is the owner of the Airport. The zoning officer for Smithfield Township issued a zoning enforcement notice to STL [1] identifying several violations, but only pertinent to this appeal is a violation regarding camping activities including RV camping and tent camping.[2] STL appealed to the Board.[3]

Before the Board, Strenz testified that he purchased the Airport in 1984, and that he provided RV parking on the southwest side of the Airport. He testified that he had a 2005 lease agreement with STL which allowed for parking for up to 15 RVs "provided it was allowed by law and or ordinance in the Township." (Township Exhibit No. 6.) He also recalled that two

RVs had been on the property before 1983 when he came to look at the property prior to his purchase of the property in 1984, and he thought the use was permitted. He considered RV rentals an accessory use to the Airport because most small private airports often encouraged camping. He did not rent out RV space to anyone who was not using the airport. STL paid him $100 for each RV slip. However, he did not view the camping as a revenue source. Strenz also stated that he always had offered camping as part of the Airport operations because "it was customary to have guys that want to fly in that will camp out under the wing or pitch a tent. We've had people that have come and had RV's at the airport. There's probably—I think probably eight or 10 different people I know that have always had—since I've been there have had an RV at the airport. Different periods of time all through that time." (May 5, 2009 Hearing Transcript at 339.) He also stated that people came to the Airport to camp out when two of the biggest air shows in the country took place, and thousands of people flew in rather than drove in. The typical duration of their stay was a day or two. Strenz stated that at no time since 1984 had the RV usage and camping ceased.

Root testified that he observed RVs at the Airport and also spoke to Wayne Rohmer (Rohmer), a Township zoning official, who was aware of camping on the Airport property in 2005 and 2006 and said nothing about it to him, leading him to assume camping was permitted on the Airport property so he did not seek Township ap-

---

1. An enforcement notice was also issued to the Airport, but it was resolved and is not part of this appeal.

2. The other violations were the retail use of the Airport property for skydiving activities and the retail sale of food and beverages associated with "after dive" parties. The ap-

peal to the Board for those violations was sustained.

3. Hearings were held before the Board on December 16, 2008; November 13, 2008; December 2, 2008; May 5, 2009; June 2, 2009; and June 15, 2009.

proval. Root testified that there was an Airport Owners Pilot Associations directory listing all of the airports which also listed all of the airports' amenities, including whether they offered camping. In Pennsylvania, he stated the directory indicated that there were 21 airports that offered camping, but there were actually more that were not listed. He explained that camping was an amenity that a pilot would seek out because pilots wanted to stay with like-minded people, and they could also go to an airport without having to go through the difficulties of finding rental cars and hotels. Additionally, a lot of people enjoyed taking their family camping while taking a cross-country flight. As for the RVs at the Airport, Root stated that there had always been numerous trailers and RVs at the Airport since he began coming there in 1995. He admitted that he owned one RV that he kept at the Airport but there were between five and 10 RVs that were leased. He also stated that his staff had RVs on the property but he did not know if they lived in them. Individuals were charged $100/month for leasing the RV slip but those who just camped out with tents were not charged. Root offered into evidence documents indicating that camping was available at other airports around Pennsylvania and the United States.

Gerald Gromlowicz (Gromlowicz), an Aviation Specialist Supervisor for the Pennsylvania Department of Transportation's Bureau of Aviation, testified that he was responsible for overseeing airport inspections throughout the entire Commonwealth. He had inspectors that were responsible for the region that included the Airport. There were a total of 800 airports and heliports in Pennsylvania, 134 of which were public use airports and heliports and the rest private use. He stated that he was aware that camping was an activity that was occurring at some of the airports in Pennsylvania for parachute jumping or during certain activity or celebrations, but all related to aviation. Gromlowicz admitted that he had no idea if the public airports that allowed camping were in compliance with the zoning regulations and were permitted uses. He specified that he did not know if campgrounds, tents, trailers, trailer parks or RVs were permitted in the M–1 Industrial District where the Airport was located.

The Board sustained the enforcement notice finding that RV and tent camping were prohibited in the M–I Industrial District under the Zoning Ordinance. The Board determined that it was not a nonconforming use because no credible evidence was presented that camping was occurring at the Airport property at the time the Zoning Ordinance was adopted in 1973, despite Strenz's testimony that there already was camping at the Airport when he purchased the property in 1984. Further, there was insufficient evidence to establish that camping was a customary connection to the principal use of an airport. "Unlike skydiving which needs an airport, the evidence did not establish any necessary or customary relationship between an airport and camping. There is insufficient evidence to establish that camping is dependent upon the principal use as an airport." (Board's November 3, 2009 decision at 16.) The Board then sustained the enforcement notice, and STL appealed to the trial court only arguing that camping was a permitted accessory use at the Airport.

 The trial court affirmed the Board noting that Section 204(3) of the Zoning Ordinance provided that any use that was not permitted in a particular district was deemed prohibited. "Camping activities are not listed as permitted or conditional uses within the M–1 industrial

district. Camping is not a permitted accessory use." (Trial court's June 10, 2010 decision at 7.) The trial court went on to state that even if it were a permitted use, the issue still remained as to whether camping was secondary to the airport itself. The trial court determined that STL did not present sufficient evidence to prove that camping was customarily incidental to public use airports. "It may be a convenience provided to the patrons of the airport, but it is not necessary for the operation of the airport. Less than 20% of public use airports allow camping and that camping is more akin to tents and tarps over airplane wings than long term stays in RVs and trailers." *Id.* This appeal by STL followed.[4]

STL contends that the Board abused its discretion by ignoring uncontradicted evidence that supported its contention that camping is an accessory use to an airport.[5] STL argues that to establish an accessory use, it has to prove that: 1) the use in question is secondary to the principal use

and 2) the use is customarily found with the principal use.[6] *Tennyson v. Zoning Hearing Board of West Bradford Township*, 952 A.2d 739 (Pa.Cmwlth.2008). STL argues that it met both prongs of this test because the Airport is the principal use of the property and camping is a secondary use because it is dependent upon the Airport for its existence—"it does not exist as a use available to those having no connection to the Airport such as general campers looking for a campsite (which is a use available in other areas of Smithfield Township). Since the camping that takes place on the Airport property is limited to pilots and others having business at the Airport, it would not occur at all if the Airport did not exist. Without an airport, there would not be any pilots flying in and needing to camp on the airfield during their overnight stays."[7] (STL's brief at 15–16.)

■ There is no question that the Zoning Ordinance does not allow any type of

4. Where the trial court has taken no additional evidence, our scope of review is limited to determining whether the Board abused its discretion or committed an error of law. *One Meridian Partners, LLP v. Zoning Board of Adjustment of City of Philadelphia*, 867 A.2d 706 (Pa.Cmwlth.2005). A court may conclude that a Board abused its discretion only if its findings are not supported by substantial evidence. By substantial evidence, we mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Valley View Civic Association v. Zoning Board of Adjustment*, 501 Pa. 550, 462 A.2d 637 (1983).

5. While the activity on the property has been described as "camping," the testimony indicates that what is taking place at the Airport in addition to tent camping and RV camping is mostly RV living. No one, though, is contending that the proposed use is that of a "trailer park."

6. This is consistent with Section 1002 of the Zoning Ordinance, which defines an accessory use as "a use clearly incidental or subor-

dinate to, and customary in connection with, and located on the same lot with the principal use."

7. STL argues that the facts in this appeal are similar to *Southco, Inc. v. Concord Township*, 552 Pa. 66, 713 A.2d 607 (1998), where our Supreme Court found that a wagering component was an accessory use to the principal use of its property as a restaurant because it was a form of entertainment similar to other forms of entertainment that were customarily incidental to that offered by other restaurants in the Township. However, our Supreme Court in *Southco* found that the wagering component was dependent upon the restaurant because the authorizing legislation, the Race Horse Industry Reform Act, Act of December 17, 1981, P.L. 435, 4 P.S. §§ 325.101–325.402, only allowed wagering facilities to exist in restaurants. Because they could not exist anywhere else, they had to be dependent upon the restaurant and had to be considered a secondary use.

camping in the M–1 Industrial District and has not since its enactment in 1973.[8] In order for camping to be allowed at the Airport, STL has to prove that camping is an accessory use to the Airport and that camping is customarily incidental to the operation of an airport. Whether a use is customarily incidental to a principal use requires an intensive fact-based analysis and an evaluation based upon a reasonable person standard. *Hess v. Warwick Township Zoning Hearing Board,* 977 A.2d 1216 (Pa.Cmwlth.2009), *petition for allowance of appeal denied,* 605 Pa. 703, 990 A.2d 731 (2010). In *Hess,* we explained that:

> "Customarily incidental" is best understood as invoking an objective reasonable person standard. Under this standard, we may look not only at how frequently the proposed accessory use is found in association with the primary use … but also at the applicant's particular circumstances, the zoning ordinance and the indications therein as to the governing body's intent regarding the intensity of land use appropriate to the particular district, as well as the surrounding land conditions and any other relevant information, including general experience and common understanding, to reach a legal conclusion as to whether a reasonable person could consider the use in question to be customarily incidental. This approach respects the need for an understandable legal standard and the flexibility that is a necessary component of the analysis.

977 A.2d at 1224.

■ Applying the above explanation to this case and to determine if the RV camp-

ing and tent camping are "customarily incidental" to an airport use, Gromlowicz testified that camping was permitted at only 20 of the 127 public use airports in Pennsylvania or less than 20%, hardly evidence of a customary connection with the principal use of an airport. Moreover, STL presented no evidence that at those airports where it was permitted whether the zoning ordinances allowed camping or whether it was a permitted accessory use. Also, there was no evidence offered by STL to show how often "campers" utilized the Airport for its skydiving business. In fact, instead of testifying that its customers were coming to learn to skydive, Root, the owner of STL, only testified that families who were taking a cross-country trip might stop along the way or pilots might stop to hang out with other pilots. Strenz, the owner of the Airport, also testified that pilots would fly in and then camp out under the wings of planes for several days either for air shows or for other reasons but also offered no supporting evidence to show how often that occurred. Simply, camping is prohibited at the Airport by the Zoning Ordinance. There is insufficient evidence to establish any necessary or customary relationship between the Airport and camping, particularly by STL, which conducts a skydiving business and not the operations of the Airport.

STL argues in its brief that the Board erred because "[i]nstead of examining STL's evidence that showed the frequency of camping at airports generally, the Board shifted its focus to the frequency of camping *at skydiving businesses.*" (Emphasis in original.) (STL's brief at 20.) However, the Board did not do any such

---

**8.** In fact, the M–1 Industrial District expressly prohibits any residential type of use in that zoning district. The Board and the Township argue that this means that camping cannot be an accessory use because all forms of residen- tial use are prohibited. However, we are not addressing residential living or RV living/trailer park living in this appeal so we need not address this issue any further.

thing. It found that STL did not prove that camping was an accessory use for either the Airport or its skydiving business stating:

> The credible evidence further did not sufficiently establish that camping is an accessory use **for the airport or STL's skydiving business.** While some airports permit camping, the evidence was insufficient to establish that it is in customary connection with the principal use of airport. Unlike skydiving which needs an airport, the evidence did not establish any necessary or customary relationship between an airport and camping. There is insufficient evidence to establish that camping is dependent upon the principal use as an airport. *The foregoing is particularly true with respect to STL and its skydiving business, which uses nearly all the existing RVs. Appellants' testimony suggested that camping at airports was an accommodation to pilots and their guests providing a place to stay when they have flown in and need somewhere to sleep overnight. With respect to STL's business, there is no apparent need for overnight stays at the airport, as STL's planes are based at the airport and the pilots are employees of STL. There was no credible evidence that camping is a customary component of a skydiving business. Certainly skydiving customers can go to hotels or campgrounds should they desire to stay overnight. To the extent STL is using the RVs to house its employees or provide accommodations for its customers, this is beyond the stated purpose for which camping is allowed in customary connection with an airport.* (Emphasis added.)

(Board's November 3, 2009 decision at 16–17.) Here, STL has not proven that the surrounding circumstances, including the Zoning Ordinance or the frequency that camping is associated with airports makes camping customarily incidental and a permitted accessory use to an airport.

Accordingly, the order of the trial court is affirmed.

### ORDER

AND NOW, this 31st day of March, 2011, the order of the Court of Common Pleas of Monroe County, dated June 10, 2010, is affirmed.